Merrimack
No. 2007-574

BARRY O. UPTON

v.

TOWN OF HOPKINTON

Argued: February 14, 2008
Opinion Issued: April 8, 2008

*Cronin & Bisson, P.C.*, of Manchester (*Daniel D. Muller, Jr.* and *John G. Cronin* on the brief, and *Mr. Cronin* orally), for the petitioner.

*Upton & Hatfield, LLP*, of Concord (*Russell F. Hilliard* and *Matthew R. Serge* on the brief, and *Mr. Hilliard* orally), for the respondent.

DUGGAN, J. The petitioner, Barry O. Upton, appeals the order of the Superior Court (*Conboy*, J.) upholding the decision of the planning board (board) for the respondent, Town of Hopkinton (Town), to condition its approval of his subdivision plan upon his paying one-third of the cost to improve a portion of Branch Londonderry Turnpike (Turnpike). We affirm.

The record reflects the following facts. The petitioner owns a 21.1-acre parcel on the Turnpike on the outskirts of Hopkinton. The Turnpike in this area is a class V gravel road surrounded by wetlands. Currently, there are five single-family residences along the Turnpike, including the petitioner's.

In August 2006, the petitioner applied to the board for subdivision approval. He proposed replacing the existing single-family residence on his property and creating four new residential lots. The board considered the application at public hearings in September, October, November and December 2006. In addition, the board took a site walk of the property, and reviewed comments from the Town's consultant engineer, fire chief, public

works director and road committee, as well as from the Town of Bow, the City of Concord, and the Central New Hampshire Regional Planning Commission.

Among the concerns raised was "access to the development should [the] . . . Turnpike be closed due to flooding." The flooding was estimated to occur approximately 500 feet from the petitioner's development. The fire department, for instance, was concerned about responding to an emergency should the Turnpike be closed. There was also concern about school bus access to the subdivision in the event that the Turnpike was closed. The board was informed that the Turnpike had been closed for flooding three times in 2005 and three times in 2006. The public works director estimated that "anytime [the town] receive[s] 2-inches of rain the road needs to be closed temporarily due to its elevation and its location through a wetland." When the Turnpike is closed, residents must travel through Bow and Concord to access their properties. Even when the Turnpike is not closed, the chief of the fire department noted that this particular location "has one of the furthest response times."

Additionally, the Central New Hampshire Regional Planning Commission opined that the petitioner's development would result in an additional thirty-eight to forty vehicle trips per day, which might "warrant road upgradings in Hopkinton." The commission observed that "based on the origins and destinations of trips from the subdivision's residents, . . . the majority of trips may be along [the] . . . Turnpike heading generally northerly towards 1-89 or to center Hopkinton or Contoocook."

At the November hearing, board members observed that because the proposed development would double the number of homes on the Turnpike and would be on the outskirts of town, the board could deny the application if it found that the application would result in a "scattered or premature subdivision . . . as would involve danger or injury to public health, safety or prosperity by reason of the lack of . . . drainage, transportation, schools, fire protection, or other public services, or necessitate the excessive expenditure of public funds for the supply of such services." RSA 674:36, II (Supp. 2007). Given this, a majority of the board believed that the petitioner needed to address "the issue of safety as a result of the condition of [the] . . . Turnpike," perhaps by paying for a portion of the cost of improving the road.

At the December hearing, the board considered what was needed to improve the Turnpike. The public works director stated that while he planned to rebuild a culvert along the Turnpike, he did not believe that this alone would alleviate the flooding. The petitioner's surveyor and engineer opined that "a box culvert or bridge [was] needed to rectify the situation. The work would require the raising of the road along with the dredging of

the brook." The Town's consultant engineer concurred. The estimated cost of installing a box culvert was between $250,000 and $300,000. The public works director informed the board that the Turnpike was not on the ten-year improvement schedule "as there are other roads that are more heavily traveled that [are] of a higher priority." Ultimately, the board voted to approve the subdivision with the condition that the petitioner bear one-third of the cost of installing a box culvert.

The petitioner appealed to the superior court, arguing that this condition violated RSA 674:21, V (Supp. 2007). In his petition, the petitioner conceded that RSA 674:21, V gave the board the "authority to assess off-site improvement costs to developers," but he asserted that the costs in this case did not bear a rational nexus to his proposed subdivision. "In this case," he contended, "the proposed project has no relationship to the area of the road in need of repair." The trial court found to the contrary, and this appeal followed.

Superior court review of planning board decisions is limited. *Summa Humma Enters. v. Town of Tilton*, 151 N.H. 75, 79 (2004). The superior court must treat the factual findings of the planning board as *prima facie* lawful and reasonable and cannot set aside its decision absent unreasonableness or an identified error of law. *Id.*; *see* RSA 677:15 (Supp. 2007). The appealing party bears the burden of persuading the trial court that, by the balance of probabilities, the board's decision was unreasonable. *Summa Humma Enters.*, 151 N.H. at 79; *see* RSA 677:15. The review by the superior court is not to determine whether it agrees with the planning board's findings, but to determine whether there is evidence upon which they could have been reasonably based. *Summa Humma Enters.*, 151 N.H. at 79. Our review of the superior court's decision is equally deferential. *Id.* We will uphold the decision on appeal unless it is unsupported by the evidence or legally erroneous. *Id.*

The petitioner first argues that because the need to upgrade the Turnpike was not "created" by his proposed development, the board could not lawfully require him to pay one-third of the cost of improving the Turnpike. Imposing this condition, he asserts, violated RSA 674:21, V(a), which provides, in pertinent part: "Upgrading of existing facilities and infrastructures, the need for which is not created by new development, shall not be paid for by impact fees." He contends that it also violated the Town's ordinance, which contains an identical provision.

The interpretation and application of statutes present questions of law, which we review *de novo*. *Babiarz v. Town of Grafton*, 155 N.H. 757, 759 (2007). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* When examining the language of a statute, we ascribe the

plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* These same rules of construction apply to zoning ordinances. *Fox v. Town of Greenland*, 151 N.H. 600, 605 (2004); *see Feins v. Town of Wilmot*, 154 N.H. 715, 719 (2007).

Impact fees "are charges assessed by a municipality to shift the cost for capital improvements necessitated by a development to the developer and new residents." 15 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, LAND USE PLANNING AND ZONING § 17.01, at 221 (3d ed. 2000). They are "functionally the same as the developer exactions traditionally made as part of the subdivision or site review process." *Id.* RSA 674:21, V defines an impact fee as "a fee or assessment imposed upon development, including subdivision [or] building construction . . . , in order to help meet the needs occasioned by that development for the construction or improvement of capital facilities owned or operated by the municipality, including . . . public road systems."

▐ Impact fees "can only be required to the extent that [they] bear[ ] a 'rational nexus' to the needs created by the project being constructed by the landowner." *Id.* § 17.04, at 225. Thus, RSA 674:21, V(a) provides that the amount of an impact fee must be "a proportional share of municipal capital improvement costs which is reasonably related to the capital needs created by the development, and to the benefits accruing to the development from the capital improvements financed by the fee." *See id.* § 17.05, at 227-28 (statute incorporates rational nexus test developed at common law); *Land/Vest Props., Inc. v. Town of Plainfield*, 117 N.H. 817, 823 (1977) (under common law, subdivider could be compelled to bear that portion of cost that bore a rational nexus to the needs created by and special benefits conferred upon subdivision) (decided before RSA 674:21 was enacted). Only a municipality that has passed an impact fee ordinance may assess an impact fee. *Simonsen v. Town of Derry*, 145 N.H. 382, 386-87 (2000).

▐ Even if a municipality does not have an impact fee ordinance, however, it may require "developers to pay an exaction for the cost of off-site improvement needs determined by the planning board to be necessary for the occupancy of any portion of a development." RSA 674:21, V(j). Like an impact fee, the amount of any exaction must bear a rational nexus to the needs created by the project. LOUGHLIN, *supra* § 17.04, at 225. Thus, RSA 674:21, V(j) provides that the amount of an exaction "shall be a proportional share of municipal improvement costs not previously assessed against other developments, which is necessitated by the development, and

which is reasonably related to the benefits accruing to the development from the improvements financed by the exaction."

■ The petitioner, focusing exclusively on a single sentence in RSA 674:21, V, and its identical analog in the Town's ordinance, argues that it was illegal for the board to require him to pay a portion of the cost of improving the Turnpike because the need for improving the Turnpike predated his subdivision application. "We do not read words or phrases in isolation, but rather in the context of the entire statute." *Appeal of Kaplan*, 153 N.H. 296, 299 (2006) (quotation omitted); *see Feins*, 154 N.H. at 719 (we determine meaning of zoning ordinance from its construction as a whole, not by construing isolated words and phrases).

■ ■ In context, the prohibition in RSA 674:21, V and the Town's ordinance against imposing impact fees to pay for upgrades to existing facilities and infrastructures applies only when the need for such upgrades is not "reasonably related" to the new development. As long as the need for the upgrade is "reasonably related" to the new development, both the statute and the Town's ordinance allow the Town to assess an impact fee to help pay for it. Where the improvements are required solely because of the development, it may be permissible for a municipality to require the subdivider to bear the total cost of improvements. *See KBW, Inc. v. Bennington*, 115 N.H. 392, 394, 395 (1975). Where, as here, the improvements are not required solely because of the development, the Town may only require the subdivider to bear "a proportional share" of their cost. RSA 674:21, V(a). Only when the need for the improvements bears *no* reasonable relationship to the proposed development is the municipality prohibited from requiring the subdivider to pay for a portion of the cost of the improvements.

■ ■ In the instant case, the record supports the board's determination that the need for the improvements to the Turnpike was reasonably related to the petitioner's proposed development. Based upon the evidence before it, the board reasonably could have found that the addition of four more residences on the Turnpike made it necessary to upgrade it now. The board could reasonably have determined that "[e]xposing more households to the risk that emergency vehicles would be unable to respond when their services were required" magnified the Turnpike's existing hazard, and made it imperative that the Turnpike be improved now. *Zukis v. Town of Fitzwilliam*, 135 N.H. 384, 389 (1992). Although the Turnpike's condition existed before the petitioner submitted his subdivision application, "a planning board must consider current as well as anticipated realities when ruling on a request for subdivision approval." *Id.* (quotation and brackets

omitted). Accordingly, we hold that the board had the authority, under both RSA 674:21, V and the Town's ordinance, to require the petitioner to pay a portion of the cost of improving the Turnpike.

 The petitioner next asserts that the board erred when it found that one-third of the cost to improve the Turnpike represented his proportional share. In assessing a developer's proportional share of the cost of an improvement, "[n]o single factor can be determinative." *Land/Vest Props., Inc.*, 117 N.H. at 824. Factors relevant to determining a developer's proportional share of the cost for road improvements may include, but are not limited to: (1) the standard to which the town currently maintains the road; (2) the frontage of the proposed subdivision; (3) the potential traffic increase necessitated by the proposed subdivision; (4) the character and potential for development of the neighborhood served by the road; and (5) the number of residences presently fronting on or normally trafficking these roads. *Id.*

The petitioner contends that the board erred because it relied exclusively upon the fact that his development would nearly double the number of homes on the Turnpike to justify the fee assessed. The record does not support this contention. In calculating the petitioner's proportional share, the board also considered evidence concerning the character of the neighborhood served by the Turnpike and the Turnpike's current condition. *See id.* Specifically, the board observed that school-aged children lived in some of the residences on the Turnpike, and noted that the Turnpike in Hopkinton was a scenic gravel road that was closed because of flooding three times in the last year. Elsewhere, as in Bow, the Turnpike is paved. The board also examined the additional distance that emergency vehicles must travel to access Turnpike residences when it is closed, and the response time of emergency vehicles to properties on this portion of the Turnpike.

For all of the above reasons, therefore, we hold that the trial court did not err when it upheld the board's decision to condition its approval of the petitioner's subdivision upon his paying one-third of the cost to improve the Turnpike.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.